IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DONNA BURKHARDT, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | Civil Action No. 3:08-CV-02032-B (BH) |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed
findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for
Summary Judgment* ("Pl. Mot."), filed April 16, 2009 (doc. #20) and *Commissioner's Motion for
Summary Judgment* ("Def. Mot."), filed June 11, 2009 (doc. #23.)  No reply brief was filed.  Based
on the evidence, the relevant filings and applicable law, *Plaintiff's Motion for Summary Judgment*
should be **GRANTED**, *Commissioner's Motion for Summary Judgment* should be **DENIED**, and
the case should be remanded to the Commissioner for further proceedings.

**I.  BACKGROUND**[1]

A.      <u>Procedural History</u>

Donna Burkhardt ("Plaintiff") seeks judicial review of a final decision by the Commissioner
of Social Security ("Commissioner") denying her claim for disability benefits under Titles II and

---

[1] The following background comes from the transcript of the administrative proceedings, which is
designated as "Tr."

XVI of the Social Security Act.  On January 20, 2006, Plaintiff filed an application for disability

benefits.  (Tr. at 117, 121, 139).  Plaintiff claimed she was disabled due to degenerative disc disease

caused by a back injury she had received during a car accident in July of 1989.  (Tr. at 238).

Plaintiff's application was denied initially on June 9, 2006, and upon reconsideration on December

12, 2006.  (Tr. at 62-65, 73-75).[2]  Plaintiff requested a hearing before an Administrative Law Judge

("ALJ") on February 20, 2007.  (Tr. at 80).  The request was not timely filed by the deadline of

February 10, 2007, but Plaintiff was able to show good cause for the delay based on the effects of

her condition and treatment on her mental state.  (Tr. at 7, 80).  A hearing, at which Plaintiff

personally appeared and testified, was held on November 8, 2007.  (Tr. at 26-54).  On May 23, 2008,

the ALJ issued his decision finding Plaintiff not disabled.  (Tr. at 7-18).  The Appeals Council

denied Plaintiff's request for review on September 12, 2008, concluding that the contentions raised

in Plaintiff's request for review did not provide a basis for changing the ALJ's decision.  (Tr. at 1-3).

Thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. at 1).  Plaintiff timely

appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. §

405(g) on November 11, 2008.

**B.**     **Factual History**

        **1.**     **Age, Education, and Work Experience**

Plaintiff was born in 1958.  (Tr. at 57, 117, 121).  At the time of the hearing before the ALJ,

she was forty-nine years old.  (Tr. at 29).  Plaintiff graduated from high school.  (Tr. at 17).  Her

past relevant work experience includes work as a data entry clerk.  (Tr. at 133, 165).  She last

---

[2] Plaintiff also filed prior Title II and Title XVI applications on August 30, 2004, November 12, 2002, and December 4, 2001. An ALJ denied these applications on August 25, 2004.  (Tr. at 7).  None of the evidence used for the prior applications was used in the claim filed on January 20, 2006.

worked on August 1, 1997.  (Tr. at 139).

## 2.    Medical Evidence

Plaintiff's medical record primarily addresses her low back injury, which she alleges caused chronic lumbar radicular syndrome.  Her condition resulted in radiating and constant pain throughout her back and lower limbs.  Plaintiff also has a history of depression and anxiety.

An MRI on February 27, 2002 showed a previous laminectomy[3] at L5-S1 and a dehydrated disc at that level, which was abutting the thecal sac[4] but not compressing it.  (Tr. at 396-97).  Results of the MRI also revealed slight annular bulge at L4-L5 and L5-S1.  *Id.*

Plaintiff's medical history included monthly visits to Dr. Matt Sloan, M.D., an ABA Board Certified Anesthesiologist who is ABA Board Certified in Pain Management.  (Tr. at 240).  During Plaintiff's first visit to him on April 21, 2003, she estimated her low back pain to be a 10 on a Visual Analog Scale ("VAS") of 1-10.  (Tr. at 238).  She claimed to have pain that was 0 on a VAS when she was on all her medications.  *Id.*  Dr. Sloan noted that Plaintiff had "a shooting pain down the bilateral legs to the bottom of her feet" and that she complained "of numbness and tingling in the bilateral legs, left greater than right."  *Id.*  Plaintiff's low back pain became aggravated by prolonged sitting, standing, walking, transferring from a sitting to standing position, and flexion of the back that was greater than extension.  *Id.*  At this same visit, Plaintiff claimed that she was having difficulty sleeping due to pain, had to sleep on her right side with a pillow between her legs, and would wake up in the morning with extreme pain.  *Id.*  Dr. Sloan noted that she had "headaches that

---

[3] A laminectomy is the excision of the posterior arch of a vertebra.  *Dorland's Illustrated Medical Dictionary* 898 (28th ed. 1994).  Between 1989 and 1992, Plaintiff underwent two laminectomies as well as a lumbar sympathetic block, a tibalis nerve injection, and a caudal ESI for the back injury caused by a car accident.  (Tr. at 238).

[4] The thecal sac is a protective sac surrounding the base of the spine beginning at the L1 level.  *Id.* at 1695.

[were] bilateral frontal to occipital in location" and were "aggravated by light and noise." *Id*. He also noted that Plaintiff had significant reactive depression and anxiety. *Id*. At a second visit two days later, Plaintiff reported taking 600 mg of Kadian, 400 mg of Methadone, 30 mg of Phenobarbital five times, and 2 mg of Xanax three times per day. (Tr. 239). She claimed that Xanax was the only thing that would help her with her anxiety. (Tr. 238). Dr. Sloan noted that she would likely benefit from an addiction medicine/psychiactric consultation and that he would like to change the way she took her Kadian and possibly wean her off Methadone, Xanax, and Phenobarbitol. (Tr. at 240).

On September 16, 2003, Dr. Sloan wrote that Plaintiff was taking "heroic doses of pain medications, specifically Kadian, 600 mg per day; MSIR for breakthrough pain; Xanax, up to 2+ per day; Phenobarbital, 5 per day; Zanaflex, and Zoloft." (Tr. at 366). He also noted that there had been no signs of tachyphylaxis (change in tolerance) since she had begun this prescription regimen several months prior. *Id*. At this visit, Plaintiff reported her pain level as 0-1 on a VAS. *Id*. On November 11, 2003, Plaintiff reported that she had decreased her intake of Xanax from the six per day she was taking when she first began seeing Dr. Sloan to two per day. (Tr. at 319). On this same day, she estimated her back and bilateral leg pain as a constant 4 on a VAS. *Id*.

On April 6, 2004, Plaintiff underwent bilateral piriformis[5] and quadratus lumborum[6] injections in the lumbar spine. (Tr. at 205-06).

On November 9, 2004, Dr. Sloan recommended that Plaintiff see a psychiatrist because she

---

[5] The piriformis muslce (musculus piriformis) is a gluteal muscle that rotates the thighs laterally. *Dorland's Illustrated Medical Dictionary*, *supra*, at 1081.

[6] The quadratus lumborum muscle (musculus quadratus lumborum) is a lower back muscle that flexes the lumbar vertebrae laterally. *Id*.

complained she was just "tired of hurting" and because of the number of medications she was taking. (Tr. at 316).  On the date of one random drug screening on November 9, 2004, Plaintiff was taking Parafon Forte, Kadian, MSIR, Xanax, Phenobarbitol, Zoloft, and Zanaflex.  (Tr. at 316).

Dr. John P. Harney, M.D., saw Plaintiff on referral from Dr. Sloan on May 31, 2005.  (Tr. at 399-400).  Plaintiff reported that she had chronic low back pain with posterior radicular pain to the feet with the right side experiencing greater pain than the left.  (Tr. at 399).  She reported no neck, shoulder, or midback pain.  *Id.*  Plaintiff estimated her back pain to be a 2 on a VAS while on her current regimen of medication.  *Id.*  She claimed that she was able to do things around the house, participate in light household activity, participate in family activity, think better, had a better mood, slept better, and had no problems with sedation or cognitive dysunction.  *Id.*  Dr. Harney noted that Plaintiff was "alert and oriented with normal language, cognition, and mood."  *Id.*  During his examination, Dr. Harney noticed "moderate posterior spinous process tenderness at L5 and S1 and bilateral sacroiliac areas" and "no piriformis tenderness."  *Id.*  Her Cranial Nerves II through XII were intact.  (Tr. at 400).  A motor test revealed normal strength and tone.  *Id.*  Dr. Harney's impression was that Plaintiff had chronic lumbar radicular syndrome, status post failed laminectomy/disectomy.  He also noted that her condition was "well controlled on current regimen with pain level of 2/10 and sustained functional improvement without side effects" and that her regimen resulted in "excellent pain control and good functional improvement."  *Id.*

On June 23, 2005, Dr. Sloan noted his disappointment that Dr. Harney was not going to be more helpful with Plaintiff's medications.  (Tr. at 283).  Plaintiff estimated her low back pain and bilateral leg pain to be a constant 2-3 on a VAS on that date.  *Id.*

On January 31, 2006, Plaintiff's prescription regimen included Kadian, Percocet, Xanax,

Phenobarbitol, Lexapro, Elavil, Parafon Forte, Neurontin, and Zanaflex.  (Tr. at 460).  She followed

this same prescription regimen through September 14, 2006.  (Tr. at 435).  On February 15, 2006,

Dr. Sloan stated that Plaintiff had not failed random drug screens and was always completely alert

when she appeared at the clinic.  (Tr. at 398).  However, he also felt she would "need to continue

on her current medication regime–or something very similar–for the remainder of her life,

particularly since she [was] able to function well and perform her activities of daily living." *Id*.  At

this same visit, Dr. Sloan also noted that Plaintiff had low back pain, lumbar spondylosis, S1

arthropathy, enthesopathy,[7] anxiety, seizures, and history of two laminectomies.  *Id*.

On April 28, 2006, Plaintiff saw Dr. A. Olufemi Layeni, M.D., for a psychiatric consultation.

(Tr. at 409-413).  Plaintiff said that she was unable to lead a normal life because of her pain, spent

most of her time on the sofa or in bed, and had been depressed for seven years.  (Tr. at 410).  Her

insomnia caused her to wake up three to four times each night.  *Id*.  Her energy and concentration

were fine, she did not have suicidal thoughts, and she had not had any manic episodes.  *Id*.  She was

experiencing recurrent panic attacks that had become much more frequent in the preceding six

months.  *Id*.  The attacks were characterized by intense anxiety, diaphoresis, trembling, shortness

of breath, light-headedness, chills, and a feeling of losing control.  *Id*.  She was once hospitalized

at Green Oaks Hospital for about twenty-four hours after going into withdrawal because her ex-

husband had stolen her medications.  (Tr. at 411).  During this stay, she experienced auditory and

visual hallucinations.  *Id*.  The only daily activity she was capable of was walking her dogs three

times a week.  *Id*.  She was unable to do any household chores due to her pain, and her mother had

---

[7] Lumbar spondylosis is a condition that results in dissolution of the lumbar vertebra. *Dorland's Illustrated Medical Dictionary*, *supra*, at 1563.  S1 arthropathy is a joint disease at the S1 vertebral level. *Id*. at 144. Enthesopathy is a disorder of the muscular or tendinous attachment to bone. *Id*. at 561.

to drive her around due to the significant amount of pain medication Plaintiff was taking. *Id*. Plaintiff had difficulty bathing, and her mother had to cook for her. *Id*. She said her social functioning was non-existent due to her condition. *Id*. Her ability to complete tasks was limited only by her physical problems. *Id*.

Dr. Layeni noted that the claimant was alert and oriented to time, person, and place. (Tr. at 412). He also noticed that she was "adequately groomed, cooperative, and obviously had difficulty staying seated for long stretches since she periodically stood up to stretch her back." (Tr. at 410). She remembered three items that were shown to her immediately and none after five minutes. (Tr. at 412). However, she did remember all three items when given hints. *Id*. Plaintiff was able to repeat six digits forward and four digits backward and go through the months of the year backwards. *Id*. She made two errors and spent a longer time than average doing serial sevens. *Id*. She was able to name the current president and the three preceding him. *Id*. She was able to interpret the proverb, "Don't cry over spilled milk." *Id*. Noting that her "[i]nsight [was] good and theoretical judgment intact," Dr. Layeni diagnosed Plaintiff as having major depressive disorder, single episode, chronic and moderate, and rated her global assessment functioning ("GAF") at 60. *Id*.

### 3.     Hearing Testimony

A hearing was held before the ALJ on November 8, 2007. (Tr. at 24). Plaintiff was represented at the hearing by counsel and also personally appeared and testified. (Tr. at 26). A vocational expert witness ("VE") was present to provide some clarifying comments to the ALJ but did not actually testify at the hearing. (*See* Tr. at 26, 41, 43).

#### a.     *Plaintiff's Testimony*

Plaintiff testified that she was forty-nine years old. (Tr. at 29). She had two laminectomies

in 1990 and 1992 and had been on her medication regimen since 1997. (Tr. at 29-30). When asked about her pain, Plaintiff said it was a 10 but that her medication helped. (Tr. at 31-32). Her medication regime had not caused liver problems. (Tr. at 32-33). When reading, she often forgot what she had just read. (Tr. at 33). She was not using any unprescribed drugs, alcohol, or tobacco, and she was visiting Dr. Sloan every month. (Tr. at 34).

When asked how much she could lift without feeling any strain or pain from the lifting, Plaintiff said she could lift two to three pounds. (Tr. at 35). She could only stand for ten minutes at the longest before she had to sit down. *Id.* She said she could walk about twenty yards before she had to stop and pause. (Tr. at 36). She could not climb stairs or ladders, crawl on her hands and knees, kneel, or bend. *Id.* She was sleeping twelve hours per day and would wake up several times in the night due to pain. *Id.* It took around an hour to go back to sleep. *Id.* Plaintiff's activities throughout the day remained the same. *Id.* She would eat and stay in the house everyday and very rarely engaged in any activities outside the house. *Id.* Her children visited her once a month. *Id.* She had no income and was living with her mother. *Id.* Plaintiff had a job as a data entry clerk in 1994 and 1995 that paid around $13,000 and mainly involved standing and entering data into a computer. (Tr. at 41-42).

On re-examination, Plaintiff's attorney asked her if her condition had always been as severe since 1997. (Tr. at 52). Plaintiff responded that it had become progressively worse because of her degenerative disc disease. *Id.* She said she was fired from her job in 1997 for not coming into work. (Tr. at 53).

### b. *VE's Statements*

The VE stated that Plaintiff had previously worked at Quality Direct Marketing company

doing data entry.  (Tr. at 41).  In response to a discussion about Plaintiff's data entry clerk job, the VE said that the job involved using the computer to print marketing jobs and sitting six hours in a day.  (Tr. at 43).  He said the job also involved lifting less than ten pounds.  *Id*.  The VE did not testify about available jobs in the economy, and the ALJ did not pose any hypothetical questions to the VE.

## C.   ALJ's Findings

The ALJ issued his decision denying benefits on May 23, 2008.  (Tr. at 7-18).  He found Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2000, and that she had not engaged in substantial gainful activity at any time since the alleged onset date of August 1, 1997.  (Tr. at 9, ¶¶ 1-2).  The ALJ disagreed with the state agency medical consultants' conclusion that Plaintiff had no severe impairments and found that Plaintiff had the severe impairments of "a back impairment and depressive disorder."  (Tr. at 10, ¶ 3).

The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1.  (Tr. at 12, ¶ 4).  More specifically, the ALJ held that Plaintiff did not meet the criteria of Listing 1.04A or C (disorders of the spine).  (Tr. at 12).  The ALJ also found that Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.04 (affective disorders) since "paragraph B" or "paragraph C" criteria were not satisfied.  (Tr. at 12-13).

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform the full range of unskilled, light work, including lifting and carrying up to twenty pounds occasionally and ten pounds frequently along with sitting, standing, and walking for six hours in an eight-hour workday, with normal breaks.  (Tr. at 14, ¶ 5).  Additionally, the ALJ determined that claimant had

the mental RFC to perform unskilled work. *Id.* The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce some degree of symptomatology but did not find her testimony credible. (Tr. at 15). The ALJ focused on the results of Dr. Harney's examination and statements that Plaintiff had made to Dr. Harney claiming that she was able to do things around the house as well as participate in light household and family activity. *Id.*

The ALJ similarly discounted Dr. Sloan's opinion that Plaintiff could carry less than ten pounds, could stand and/or walk less than fifteen minutes, and must alternate sitting and standing positions every fifteen minutes. (Tr. at 15). The ALJ based his mental RFC determination largely on Dr. Layeni's examination. (Tr. at 16). The ALJ noted that Dr. Sloan's opinion about Plaintiff's RFC was not entitled to controlling weight since the determination of a person's RFC is an issue reserved to the Commissioner. *Id.*

The ALJ then determined that Plaintiff was unable to perform any of her past relevant work. (Tr. at 16, ¶ 6). The ALJ considered Plaintiff's RFC and relevant vocational characteristics, concluding that the Medical-Vocational Rules directed a finding of "not disabled." (Tr. at 17). The ALJ also determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. (Tr. at 17, ¶ 10). The ALJ did not rely on any vocational expert testimony to reach this conclusion. *Id.*

## II. ANALYSIS

### A.  Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.   42 U.S.C. § 405(g), 1383(C)(3); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Thus, the Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id.*

### 2.      Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by vocational expert testimony, or other

similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents the following issues for review:

(1)      The ALJ's RFC finding is not supported by substantial evidence; and

(2)      The ALJ failed to properly evaluate the opinion of Plaintiff's treating physician.

(Pl. Mot. at 1).

**C.      Issue One: Residual Functional Capacity**

Plaintiff first contends that the ALJ's findings that she had the mental RFC to perform unskilled work and that she had the physical RFC to perform the full range of unskilled, light work are not supported by substantial evidence.  (Pl. Mot. at 3-8).

Residual functional capacity is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  To perform the full range of a certain level of work, a person must be able to perform all or substantially all of that range of work.  SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983).

"The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  An ALJ may consider an individual to have no limitation or restriction with respect to a functional capacity when

there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction.  SSR 96-8p, 1996 WL 374184, at *1.  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  *Id*.  An ALJ's decision can be supported by substantial evidence even if the ALJ does not specifically discuss all evidence that supports his decision or all evidence that was rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  However, the ALJ must explain his decision.  *Id*.

Substantial evidence exists when there is enough relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Leggett*, 67 F.3d at 564.  Even if the reviewing court would reach a different conclusion based on the evidence in the record, the court must defer to the ALJ if there is substantial evidence to support his conclusion.  *Leggett*, 67 F.3d at 564.  Nevertheless, this standard of review is not simply an uncritical "rubber stamp" and "involves more than a search for evidence supporting the" ALJ's decision; the reviewing court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984).  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision.  *Johnson*, 864 F.2d at 343.

## 1.      Mental RFC

Plaintiff contends that the ALJ's determination that she had the mental capacity to perform unskilled work is not supported by substantial evidence.  (Pl. Mot. at 3).

"Unskilled work is work which needs little or no judgment to do simple duties that can be

- 14 -

learned on the job in a short period of time."  20 C.F.R. § 404.1568(a) (2008).  "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."  SSR 85-15, 1985 WL 56857 at *4 (S.S.A. 1985).  "A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base."  *Id*.

Plaintiff argues that the ALJ's admission that she had moderate limitations on the persistence and pace of her concentration as well as moderate limitations on her social functioning was inconsistent with his finding that she could perform unskilled work.  (Pl. Mot. at 3; *see* Tr. at 13). She points to findings by the state agency medical consultant, Dr. Gilliland, that she had moderate limitations on her ability to concentrate, interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors.  (Pl. Mot. at 3; *see* Tr. at 483). Plaintiff also notes Dr. Sloan's findings that she had severe mental limitations as well as a history of anxiety.  (Pl. Mot. at 3; *see* Tr. at 240, 255, 300, 359, 451, 492).

The ALJ's mental RFC finding is supported by substantial evidence.  There is enough relevant and sufficient evidence for a reasonable mind to accept the ALJ's conclusion that any mental impairments Plaintiff did have were not significant enough to prevent her from performing unskilled work.  *See Leggett*, 67 F.3d at 564.  The ALJ primarily relied on Dr. Layeni's report in making his assessment that Plaintiff could perform unskilled work.  (Tr. at 16; *see* Tr. at 410-12). Dr. Layeni found that Plaintiff's ability to complete tasks was only limited by her physical problems and that she was alert and oriented to time, person, and place.  (Tr. at 411).  During his examination, Plaintiff remembered three items he showed to her immediately and none of them after five minutes,

although she remembered all three when given hints. (Tr. at 412). She could remember what she had for dinner the night before, could do simple math, could repeat six digits forward and four digits backwards, and could go through the months of the year backwards. *Id*. She could name the current president and the three preceding him. *Id*. She was also able to interpret the proverb, "Don't cry over spilled milk." *Id*. Dr. Layeni found that Plaintiff's insight was good and that her theoretical judgment was intact. *Id*. This report alone constitutes substantial evidence to support the ALJ's findings. *See Leggett*, 67 F.3d at 564.

Furthermore, the ALJ's finding that there were some moderate limitations on Plaintiff's ability to perform unskilled work was not inconsistent with his mental RFC determination. Moderate limitations on an individual's ability to perform some aspects of unskilled work do not preclude that individual from performing unskilled work because "losses of intellectual and emotional capacities are generally more serious when the job is more complex." *See* SSR 85-15, 1985 WL 56857 at *4. Unskilled work is the lowest skill level of work in the context of an individual's RFC. *See* 20 C.F.R. § 404.1568(a). Simply because the ALJ found Plaintiff had some moderate limitations on her concentration and social functioning abilities did not make his later finding that she had the mental RFC to perform unskilled work inconsistent.

Likewise, Dr. Gilliland's report did not necessarily contradict the ALJ's RFC determination. Dr. Gilliland only found Plaintiff to have marked limitations in two areas: her ability to understand and remember detailed instructions and to carry out those detailed instructions. (Tr. at 482). Neither of these abilities are required to perform unskilled work. *See* SSR 85-15, 1985 WL 56857 at *4. On the other hand, he found she did not have significant limits on her ability to understand, remember, and carry out very short and simple instructions. (Tr. at 482). Both of these abilities are

highly important for unskilled work.  *See* SSR 85-15, 1985 WL 56857 at *4.  While Dr. Gilliland did find some moderate limitations on her concentration and certain aspects of her social functioning, his findings predominantly indicated that Plaintiff had no significant limits on her mental capacity.  (*See* Tr. at 482-83).

For these reasons, the Court finds that the ALJ's determination that Plaintiff had the mental RFC to perform unskilled work is supported by substantial evidence.  *See Leggett*, 67 F.3d at 564.

### 2.      Physical RFC

Plaintiff next argues that the ALJ's conclusion that she had the physical RFC to perform the full range of unskilled, light work is not supported by substantial evidence.  (Pl. Mot. at 6-8).

Light work requires lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds.  20 C.F.R. § 416.967(b).  The full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday as well as sitting for this same time period.  *Id.*; SSR 83-10, 1983 WL 31251, at *5.  An individual's physical RFC can potentially be limited by nonexertional impairments and exertional limitations.  *See* 20 C.F.R. § 404.1569a(b)-(c) (2003).

#### a.     *Nonexertional Impairments*

Plaintiff alleges that the ALJ's physical RFC determination is not supported by substantial evidence because her nonexertional impairments, specifically her severe pain and her postural-manipulative limitations, prevent her from performing the full range of unskilled, light work.  (Pl. Mot. at 6-8).

A nonexertional impairment is any impairment and its related symptoms that does not directly affect an individual's ability to sit, stand, walk, lift, carry, push, or pull.  20 C.F.R. §

404.1569a(b).  These impairments can significantly reduce an individual's capacity to perform the full range of a certain level of work.  *See* 20 C.F.R. § 404.1569a(c); SSR 85-15, 1985 WL 56857 at *4-8.

### i. Severe Pain

First, Plaintiff challenges whether the ALJ's determination that her severe pain did not limit her capacity to perform the full range of unskilled, light work is supported by substantial evidence. (Pl. Mot. at 6).  To support her argument, Plaintiff points to the large amount of medication she was taking as well as Dr. Sloan's statement that he believed Plaintiff would have to remain on her current medication regimen for the rest of her life. *Id.*

An individual's severe pain can potentially rise to the level of a nonexertional impairment or an exertional limitation.  *See* 20 C.F.R. § 404.1569a(b).  For a court to conclude that an individual's pain is severe enough to constitute a nonexertional impairment or an exertional limitation, there "must be clinical or laboratory diagnostic techniques which show the existence of a medical impairment which could reasonably be expected to produce the pain alleged."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

The ALJ's opinion as to the effect of Plaintiff's pain as a nonexertional impairment on her residual functional capacity is supported by substantial evidence.  The ALJ's opinion and the record include enough relevant and sufficient evidence that a reasonable mind could accept as adequate to support the ALJ's conclusion.  *See Leggett*, 67 F.3d at 564.  The ALJ determined that both Plaintiff and her treating physician, Dr. Sloan, were not credible about the intensity, persistence and limiting effects of Plaintiff's alleged severe pain.  (Tr. at 15).  He based this determination largely on a report from the examining physician Dr. Harney that stated that Plaintiff had "excellent pain control and

good functional improvement" on her current pain regimen.  (Tr. at 400).  Plaintiff indicated to Dr.

Harney that she had low back pain at a 2 on a VAS.  *Id.*  Furthermore, Dr. Sloan and Plaintiff made

several similar statements that Plaintiff's prescription regimen had reduced her pain and allowed her

to function more normally.  (Tr. at 32, 238, 357, 398).   Thus, the ALJ's conclusion on this issue is

supported by substantial evidence.  *See Leggett*, 67 F.3d at 564.

### ii.  Postural-Manipulative Limitations

Second, Plaintiff challenges whether the ALJ's determination that her postural-manipulative

limitations do not limit her capacity to perform the full range of unskilled, light work is supported

by substantial evidence.  (Pl. Mot at 7).  Plaintiff argues that the ALJ's determination was

inconsistent with the  state agency medical consultant's report,  which the ALJ found credible, that

suggested that Plaintiff had some postural-manipulative limitations.[8]  *Id.*

An individual's postural-manipulative limitations are a type of nonexertional impairment.

20 C.F.R. § 404.1569a(c)(1)(vi); SSR 85-15, 1985 WL 56857 at *6-7.  The postural-manipulative

limitations relevant to this inquiry include a person's ability to climb, balance, stoop, kneel, crouch,

crawl, and manipulate objects with their hands. 20 C.F.R. § 404.1569a(c)(1)(vi);  SSR 85-15, 1985

WL 56857 at *6-7.[9]  The combined effect of different postural-manipulative limitations can

drastically affect an individual's physical RFC.  *See* SSR 85-15, 1985 WL 56857 at *6-7.  For

example, while limitations on an individual's ability to climb and balance alone would most likely

not have a significant impact on the "broad world of work," additional limitations would have a

significant impact.  *See id.* at *6.  In comparison, a person who can only occasionally stoop can

---

[8] The state agency medical consultant's report stated that Plaintiff could only occasionally climb stairs or ramps, stoop, crouch, and could never climb ladders, ropes, or scaffolds.  (Tr. at 403).

[9] Plaintiff does not challenge any findings about her ability to manipulate objects with her hands.

perform virtually all of the full range of light work.  *Id*. at *7.

The ALJ's conclusions about the effect of Plaintiff's postural-manipulative limitations on her physical RFC are supported by substantial evidence.  Although Plaintiff does point to a great deal of evidence in the record that supports her argument, there is enough relevant and sufficient evidence for a reasonable mind to accept the ALJ's conclusion that these postural limitations would not preclude Plaintiff from performing the full range of unskilled, light work activity.  *See Leggett*, 67 F.3d at 564.  For example, Plaintiff's treating physician indicated that her medications were helpful and enabled her to perform her activities of daily living, Plaintiff could walk her dogs three times a week, Plaintiff could engage in light household activity, and Plaintiff could participate in family activity.  (Tr. at 363, 399, 411).  An examining physician, Dr. Harney, also noted that her coordination and gait were normal, her tandem walk was normal, and that her pain was controlled on her current prescription regimen. (Tr. at 399).  Furthermore, the combination of postural-manipulative limitations listed in the state agency medical consultant's report do not necessarily prevent Plaintiff from performing all or substantially all of the full range of light work, although they would likely prevent her from performing the full range of medium, heavy, or very heavy work.  *See* SSR 85-15, 1985 WL 56857 at *7 (noting that even moderate limitations on a person's ability to stoop and crouch would affect their ability to perform the full range of medium, heavy, and very heavy work but not light work).

Consequently, the ALJ's findings about the effect of Plaintiff's nonexertional limitations on her physical RFC are supported by substantial evidence.  *See Leggett*, 67 F.3d at 564.

### b.  *Exertional Limitations*

Plaintiff also challenges whether the ALJ's findings as to the effect of exertional limitations

on her capacity to perform the full range of unskilled, light work are supported by substantial evidence. (Pl. Mot. at 7-8). Noting that her treating physician found significant limitations on her ability to perform the exertional activities required for light work, Plaintiff challenges the ALJ's findings that she could sit, stand, and walk for up to six hours of an eight-hour workday with regular breaks and that she could carry the required amount of weight. *Id.*

An exertional limitation exists when "the limitations and restrictions imposed by [an individual's] impairment(s) and related symptoms, such as pain, affect only [the individual's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). Nonexertional impairments and exertional limitations can have a combined effect that limits an individual's capacity to perform the full range of a certain level of work. *See* 20 C.F.R. § 404.1569a; *Fraga*, 810 F.2d at 1305.

The full range of light work requires lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds as well as standing and walking, off and on, for a total of approximately six hours of an eight-hour workday with regular breaks. 20 C.F.R. § 416.967(b); SSR 83-10, 1983 WL 31251, at *5. Notably, the functional capacity to perform light work includes the functional capacity to perform sedentary work unless a determination is made that there are additional limiting factors on a person's physical RFC, such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 416.967(b). Thus, the functional capacity to perform the full range of light work also requires sitting for a total of approximately six hours of an eight-hour workday as is required to perform the full range of sedentary work. *See id.*; SSR 83-10, 1983 WL 31251, at *5.

The ALJ's determination that Plaintiff could sit for at least six hours of an eight-hour

workday with regular breaks is not supported by substantial evidence.  First, the ALJ regularly overlooked the contradicting evidence within the evidence he relied upon to reach his conclusion. "[T]he ALJ must consider all the record evidence and cannot 'pick and choose' the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000).  To reach his decision regarding Plaintiff's physical RFC, the ALJ strongly relied on the report of an examining physician, Dr. Harney.  (Tr. at 15; *see* Tr. at 400).  Dr. Harney's report did contain some evidence that would be relevant to assess Plaintiff's exertional limitations, but the ALJ only mentioned the evidence that supported his conclusion.  (Tr. at 15).  He did not mention in his RFC discussion where Dr. Harney found "moderate posterior spinous process tenderness at L5 and S1 and bilateral sacroiliac areas" or where he determined Plaintiff had "chronic lumbar radicular syndrome."  (Tr. at 399-400). Likewise, the ALJ heavily relied on Dr. Layeni's psychiatric evaluation to rebut Plaintiff's mental impairment claims but overlooked statements made by Dr. Layeni that contradicted his physical RFC determination.  (Tr. at 16).  While performing his psychiatric evaluation on Plaintiff, Dr. Layeni noticed that she "obviously had difficulty staying seated for long stretches since she periodically stood up to stretch her back" and that the she "stood up at least five times during the hour she spent with me."  (Tr. at 410, 412).  In comparison, the ALJ found Dr. Sloan, Plaintiff's treating physician, not at all credible even though Dr. Sloan noted the same restrictions on Plaintiff's ability to sit that Dr. Layeni observed.  (Tr. at 16; *see* Tr. at 488).

Second, the ALJ never addressed in his RFC discussion some medical evidence that would have been highly relevant to determine Plaintiff's exertional limitations.  Most significantly, the ALJ never mentioned an extensive orthopedic examination on Plaintiff's spine flexibility that revealed significant limits on many basic spinal movements along with high degrees of pain associated with

those movements.  (Tr. at 229-237).  The ALJ also did not mention an MRI performed on  February

27, 2002 that revealed that Plaintiff had dehydrated discs at the L3-L4, L4-5, and L5-S1 levels with

the L5-S1 level disc abutting the thecal sac (protective sac around the nerve endings exiting the

spine below the L1 spinal level) but not compressing it.  (Tr. at 396-97).  This test found an annular

bulge at the L4-L5 and L5-S1 level.  *Id*.

Third, the ALJ quickly disregarded a significant majority of the evidence in the record that

contradicted his finding that Plaintiff could sit for six hours of an eight-hour workday.   In addition

to the evidence discussed above, the ALJ did not place much significance on Plaintiff's (1) surgical

history, (2) frequent spinal injections for pain, (3) claims that back surgeries had made her pain more

severe, (4) testimony at the ALJ hearing, (5) severe pain from basic motor movements, and (6) her

treating physician's occupational assessment of her ability to sit for no longer than fifteen minutes

without requiring a break.  (Tr. at 25-54, 230, 238, 339, 347, 374, 489).  Furthermore, Dr. Sloan

noted at his very first visit with Plaintiff on April 21, 2003, and in his final evaluation of Plaintiff

on November 7, 2007, that Plaintiff had significant limits on her ability to sit for long periods of

time.  (Tr. at 238, 488).  In spite of a significant majority of the evidence in the record that suggested

Plaintiff did have exertional limitations, the ALJ claimed that Dr. Sloan's assessment of Plaintiff's

exertional limitations were "based on [her] subjective complaints with no supporting medical

documentation."  (Tr. at 16).

The most notable evidence that supports the ALJ's decision that Plaintiff could sit for six

hours of an eight-hour workday was a report from Dr. Collier, a state agency medical consultant, that

stated that Plaintiff had no exertional limitations on her ability to sit.  (Tr. at 402).  The ALJ found

the state agency consultants to be generally credible based on the evidence he included in his RFC

- 23 -

discussion. (Tr. at 16). While the reviewing court cannot reweigh the evidence, this does not entitle the ALJ to weigh the evidence however he chooses; the ALJ must follow the proper legal standards when evaluating the evidence. 42 U.S.C. § 405(g), 1383(C)(3); *Greenspan*, 38 F.3d at 236. Social Security Ruling 96-6p states that "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record" and "are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 02, 1996). A state agency medical consultant's opinion does not constitute substantial evidence when it is consistently contradicted by the medical evidence in the record. *See id*.; *Martin*, 748 F.2d at 1031. The medical evidence in the record consistently contradicted Dr. Collier's and the ALJ's finding about Plaintiff's ability to sit. Thus, Dr. Collier's assessment that Plaintiff could sit for six hours of an eight-hour workday does not constitute substantial evidence to support the ALJ's determination on this issue.

In his cross-motion for summary judgment, Commissioner does not directly address Plaintiff's arguments about her exertional limitations. Instead, Commissioner focuses mostly on the fact that Plaintiff's condition was stable and that her pain did not meet the legal definition of disabling. (Def. Mot. at 7 (citing *Lovelace v. Bowen*, 813 F.2d 55 (5th Cir. 1987)). *Lovelace* only briefly mentions substantial evidence limited to the issue of the evidentiary weight an ALJ can attribute to a claimant's physical appearance at an administrative hearing. *See Lovelace*, 813 F.2d at 59. Thus, this authority does not impact the issues raised on this appeal.

Consequently, the ALJ erred in his physical RFC determination. The ALJ's decision that Plaintiff can perform the full range of unskilled, light work is not supported by substantial evidence

- 24 -

because there is not substantial evidence to support the ALJ's finding that Plaintiff can sit for six hours of an eight-hour workday.  Because the ALJ erred at the RFC determination stage of the proceedings, these errors necessarily impact the two remaining steps of the sequential disability determination process, so the Court does not consider the remaining issue raised by Plaintiff.

## III.   RECOMMENDATION

The Court **RECOMMENDS** that *Plaintiff's Motion for Summary Judgment* (doc. #20) be **GRANTED**, *Commissioner's Motion for Summary Judgment* (doc. #23) be **DENIED**, and the decision of the Commissioner be **REVERSED** and the case be **REMANDED** for reconsideration.

.      **SO RECOMMENDED**, on this 12th day of August, 2009.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE


## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE